IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 4:03cr43(5) |
| | : | |
| v. | : | Judge Jones |
| | : | |
| ALFRED SLAUGHTER | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM AND ORDER

June 10, 2005

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion to Suppress Physical Evidence ("the Motion")(doc. 249) filed by the defendant, Alfred Slaughter ("Defendant" or "Slaughter"), on February 23, 2005. For the reasons that follow, the Motion will be granted in part and denied in part.

## PROCEDURAL HISTORY:

On February 13, 2003, the Grand Jury for the Middle District of Pennsylvania returned a multi-count indictment against Slaughter and four co-defendants, charging them with various drug trafficking offenses. (See Rec. Doc. 1). Count One of the indictment charges Slaughter and the four co-defendants with the following: conspiracy to possess with intent to distribute and distribution of more than fifty grams of cocaine base, known as crack, more than five kilograms

1

of cocaine, more than one hundred kilograms of marijuana, and an undetermined amount of heroin, all in violation of 21 U.S.C. § 846. Count Four of the indictment charges Slaughter with the distribution of more than five grams of cocaine base, known as crack, on May 29, 2002, in violation of 21 U.S.C. § 841.

The pending Motion to Suppress Physical Evidence has been briefed by the parties. An evidentiary hearing and oral argument on the Motion were conducted on April 19, 2005. At the conclusion of the proceedings, the Court instructed counsel to supplement the record with certain documents which will be referred to in our analysis. Having received those supplements, the record is now closed and the matter is ripe for our review.

At the evidentiary hearing, the Government called Deputy United States Marshal Alix Fils-Aime ("Marshal" or "Marshal Fils-Aime") as its only witness. Slaughter did not call any witnesses. The following constitutes the Court's findings of fact based upon the testimony presented at the hearing.

**<u>FINDINGS OF FACT</u>:**

We are presented with the difficult task of considering a hodgepodge of inconsistent information, including testimony that contradicts several portions of the affidavit for a search warrant in this case. Our first task is to take the rather unfortunate record created in this case and attempt to find facts which will aid us in

our resolution of the Motion.  As a result, we are able to discern the following.

On February 13, 2003, the Grand Jury for the Middle District of Pennsylvania returned a multi-count indictment against Slaughter and four co-defendants, charging them with various drug trafficking offenses.  On February 13, 2003, the Court ordered that a warrant be issued for the arrest of Slaughter, which was issued.  (Gov. Ex. 3-4).  It is undisputed by the parties that there was a valid arrest warrant for Slaughter in the case sub judice.

As part of his responsibilities, Marshal Fils-Aime testified that he executes warrants issued by the court for the arrest of individuals who have been indicted pursuant to a grand jury indictment and that he participates in fugitive investigations by attempting to arrest individuals.  Marshal Fils-Aime personally received Slaughter's arrest warrant on February 27, 2003 and attempted from that date onward to locate him.

On May 2, 2003, Marshal Fils-Aime went to 507 Thomas Avenue in Williamsport, Pennsylvania, as he had developed information that Slaughter was residing therein.  When Marshal Fils-Aime traveled to that location, he received information that Slaughter had been at the 507 Thomas Avenue address for a time on the prior night, but that he had then traveled to 806 Wildwood Boulevard in Williamsport late in the evening of May 1, 2003.  Upon receipt of that information,

3

Marshal Fils-Aime arrived at 806 Wildwood Boulevard in Williamsport, Pennsylvania between 9:00 a.m. and 11:00 a.m with other officers, to locate Slaughter.  Upon arriving, Marshal Fils-Aime knocked at the door at 806 Wildwood, which the tenant of the premises, Stacy Wertz ("Ms. Wertz") answered. After Marshal Fils-Aime asked Ms. Wertz where Slaughter was located, she initially seemed hesitant, and responded that she did not know.  After asking her a second time, Ms. Wertz began to motion with her head up the stairs in an evident attempt to demonstrate to Marshal Fils-Aime where Slaughter was within the residence.  Based on that, the Marshal entered the residence and proceeded up the stairs, at which time he located Slaughter and executed the arrest warrant. Slaughter was placed in handcuffs and searched incident to his arrest. Subsequently, Marshal Fils-Aime asked Ms. Wertz for consent to search the residence, which she provided.  The Marshals then brought in a narcotics dog who indicted the presence of drugs within a purplish-blue soft nylon travel bag ("the bag") located on the second floor of the residence.  After asking Ms. Wertz to whom the bag belonged, Ms. Wertz told the Marshal that it belonged to Slaughter.

Marshal Fils-Aime thereafter loaded the subject bag into a vehicle and it was

transported back to the Federal Building in Williamsport.[1]  Slaughter, after his

arrest, was placed and transported in a different vehicle than the bag.  Marshal Fils-

Aime then prepared an Application and Affidavit For a Search Warrant

("Affidavit") of the contents of the above-referenced bag recovered at 806

Wildwood Boulevard, which was subsequently signed and issued by Magistrate

Judge William H. Askey on May 2, 2003.  A search of the bag's contents occurred

after the Marshals received a search warrant for the bag.  (See Gov. Ex. 2).  The

contents of the bag included the following: a pocket digital scale; a stolen 9 mm

semi-automatic pistol with one magazine serial # 2032274; ammunition; "20" .22

long rounds and "9" mm rounds; miscellaneous drug paraphernalia; razor with

white powder; syringe caps; keys; identification; papers; and cellular phones.  Id. at

3.

        At this juncture it is important to note that although admittedly, portions of

the Affidavit were inconsistent with Marshal Fils-Aime's testimony before the

---

[1] As we will discuss in detail below, the Marshal testified that it is the standard operating procedure of the United States Marshals to inventory all items of which the United States Marshals take custody incident to a lawful arrest.  In this case, however, Marshal Fils-Aime contacted counsel for the Government, Mr. McCann, who instructed the Marshal to get a search warrant prior to searching the bag.  Therefore, in an obvious effort to provide an additional layer of support, which in retrospect proved to be unnecessary and ill-considered, the Marshal did not inventory the bag, in accordance with standard protocols.

        We speculate that it is possible that the narcotic dog's hit on the bag at issue led the Marshal to contact Mr. McCann, which led to the process of obtaining a search warrant in this case. While it is unclear to the Court why the Marshal contacted Mr. McCann instead of simply inventorying the bag, the resolution of this inquiry is not necessary to resolve the Motion.

Court on April 19, 2005, we believe that this occurred as a result of inadequate preparation prior to the hearing and because of Marshal Fils-Aime's considerable case load.[2]  Based on the sheer number of arrests that Marshal Fils-Aime has conducted since the arrest of Slaughter, approximately 700, it would be unreasonable to require the Marshal to instantly recall the minute details of any one case.  We therefore do not attribute the inconsistencies previously noted on the part of Marshal Fils-Aime to constitute a deliberate intention to perjure himself before the Court.

The Defendant urges the Court to focus our inquiry on the Affidavit and the inconsistencies in Marshal Fils-Aime's testimony, to the exclusion of other significant facts.  While this avenue might lead to the suppression of the contents of the bag at issue, our inquiry cannot properly be restricted to one which is Affidavit specific in the case <u>sub judice</u> for the reasons that follow.

**<u>DISCUSSION</u>:**

Slaughter submits several arguments in support of his assertion that the bag

---

[2] As the Defendant submits to the Court, the inconsistencies between the Affidavit and the Marshal's subsequent testimony before the Court on April 19, 2005 concern: the location of the Defendant when the Marshal executed the arrest warrant; whether an "8 ball" of what appeared to be crack cocaine was located on the night stand next to the bed in which the Defendant was found; the location of Defendant's pants; and the Marshal's conduct with regard to securing the bag.

at issue should be suppressed, that the Court should likewise suppress any and all

physical evidence obtained from the bag, and finally that any and all statements

made to interrogators prior to advisement of his Miranda rights should also be

excluded from trial.

First, Slaughter asserts that the entry by the United States Marshals into the

806 Wildwood Boulevard residence in Williamsport, Pennsylvania without a

search warrant or probable cause to know that Slaughter was contained therein

violated his Fourth Amendment rights.  Second, Slaughter argues that the United

States Marshals violated Slaughter's Fifth Amendment right against self-

incrimination by subjecting him to a custodial interrogation without first informing

him of his Miranda rights.  Third, Slaughter maintains that the United States

Marshals violated his Fourth Amendment rights by searching the bag at 806

Wildwood Boulevard without Slaughter's consent prior to obtaining a valid search

warrant.  Moreover, Slaughter asserts that the Affidavit, upon which the May 2,

2003 search warrant for the bag was based, contained statements gathered from an

in-custody interrogation before he was Mirandized; is blatantly inconsistent with

Marshal Fils-Aime's April 19, 2005 testimony; and contained hearsay from

individuals who were not presented by the prosecution for cross-examination

during the hearing.

7

We will address these arguments in turn.

**A.** **Entry into 806 Wildwood Boulevard to Execute Valid Arrest Warrant**

Marshal Fils-Aime's testimony at the April 19, 2005 hearing reveals that the United States Marshals arrived at 806 Wildwood Boulevard in Williamsport, Pennsylvania with an undisputedly valid arrest warrant for Slaughter, had probable cause to believe that Slaughter was located at 806 Wildwood Boulevard on May 2, 2003, and that the tenant of the afore-mentioned premises acknowledged to the Marshals that Slaughter was located on the second floor of the residence. (Hearing Transcript of 4/19/05 on Defendant's Motion to Suppress ("T. on Mot. Suppress") at 7-11).  Marshal Fils-Aime then entered the residence and executed the arrest warrant for Slaughter.  Consequently, we conclude that the entry into 806 Wildwood Boulevard did not violate Slaughter's Fourth Amendment rights because the officers had probable cause to believe that Slaughter was located therein, the officers entered the residence armed with an arrest warrant for Slaughter's arrest, and the tenant of the premises acknowledged to the officers that Slaughter was located therein.  See United States v. Agnew, 2005 U.S. App. LEXIS 8247 (3d Cir. 2005)(Law enforcement personnel are permitted to execute a valid arrest warrant by entering the home of a third party if the officers have probable cause to believe that the suspect is located therein.)

8

**B.**     **Statements Made by Slaughter Before Being Advised of his
Miranda Rights**

A person in custody must be apprised of his Fifth Amendment rights prior to

being subjected to interrogation.  Miranda v. Arizona, 384 U.S. 436 (1960).   The

Supreme Court held in Miranda that preinterrogation warnings are required in the

context of custodial interrogations given "the compulsion inherent in custodial

surroundings."  Id. at 458; see also Yarborough v. Alvarado, 541 U.S. 652, 661

(2004).  "At the outset, if a person in custody is to be subjected to interrogation, he

must first be informed in clear and unequivocal terms that he has the right to

remain silent."  Miranda, 384 U.S. at 467-68.  The Supreme Court explained in

Rhode Island v. Innis, 446 U.S. 291 (1980), that the Miranda safeguards come into

play whenever a person in custody is subjected to either express questioning or its

functional equivalent.  Id. at 300-301.  "That is to say that the term 'interrogation'

under *Miranda* refers not only to express questioning, but also to any words or

action on the part of the police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect."  Id. at 301.  In determining whether an

individual was in custody, a court must examine all of the circumstances

surrounding the interrogation, but "the ultimate inquiry is simply whether there

[was] a 'formal arrest or restraint on freedom of movement' of the degree

9

associated with a formal arrest.'" <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)(<u>quoting</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)(*per curiam*)).

For the reasons that follow, we conclude that because Slaughter was subjected to a custodial interrogation by Marshal Fils-Aime, the United States Marshals were required to inform Slaughter of his <u>Miranda</u> warnings.

First, Slaughter was in custody upon his arrest and removal from the residence located at 806 Wildwood Boulevard.  At the hearing before the Court on April 19, 2005, Marshal Fils-Aime testified that after Ms. Wertz indicated that Slaughter was located inside the residence at issue, he entered, proceeded up the stairs, and executed the arrest warrant by arresting Slaughter.  Marshal Fils-Aime testified that he handcuffed Slaughter immediately.  We find that the custody requirement of <u>Miranda</u> is satisfied as Slaughter was formally placed under arrest while in the residence of 806 Wildwood Boulevard and as he was removed from the residence in a police vehicle.   <u>Stansbury</u>, 511 U.S. at 323; <u>see also</u> <u>Oregon</u>, 429 U.S. at 495.

The second element to consider in determining whether the United States Marshals were required to read Slaughter his <u>Miranda</u> warnings is whether an interrogation occurred or its functional equivalent.  <u>United States v. Dover</u>, 1996 U.S. Dist. LEXIS 17415, *8 (E.D. Pa. 1996).  The first statement by Slaughter

which we must consider is his request for his medical identification, which was located in the bag.  Marshal Fils-Aime testified that Slaughter acknowledged that the bag belonged to him as a result of his request that his medical identification or medical information be retrieved by the Marshal from the bag while both Marshal and Slaughter were seated in a police vehicle.  The exchange between Marshal Fils-Aime and counsel for the Government then proceeded in the following fashion.

> Q.   Did you ask him [Slaughter] or did he volunteer the information?
>
> **A.   He may have volunteered it, I can't be certain.  I may have – because I asked him if anything else was in the bag, because the bag was quite heavy.**
>
> Q.   I'm going to ask you to refresh your recollection by reading on page four, paragraph 21.  Does that refresh your recollection of what took place?
>
> A.   Yes, it does.
>
> Q.   And tell the court, please, exactly what took place concerning the bag.
>
> A.   While he was being placed in the vehicle he had asked, for one thing, if we could put his hands in front of his body instead of –he was handcuffed behind his back.  And he said that he wanted his – if he was going to be going to jail, I said, yes, and he asked if he could get his medical ID, he needed his medical ID if he was going to be going to jail, and it was in that purplish bag.

11

Q.    And was this – did he volunteer this information or was this as
      a result of questioning?

A.    No, he volunteered it.

T. on Mot. Suppress at 18.

The Government argues that Slaughter's statements concerning his medical identification being located in the bag were volunteered and were not the result of interrogation.  "While he was in custody and his *Miranda* warnings had not been given to him he volunteered the information."  (See Rec. Doc. 283, at 2).

Marshal Fils-Aime's testimony indicated ambivalence with regard to whether Slaughter volunteered the statement concerning his medical identification. Although the Affidavit clearly states that Slaughter "blurted out" the statement at issue, which leans in favor of finding that Slaughter made a voluntary statement, the evident unclarity prevents us from placing any substantial reliance upon the Affidavit's contents in support of the Government's contention that Slaughter did in fact volunteer the statement.  In fact, before the Marshal's recollection was refreshed, he stated that he may have prompted Slaughter's statement because the Marshal asked "if anything else was in the bag, because the bag was quite heavy." (T. on Mot. Suppress at 18).  We therefore find that Slaughter was subjected to custodial interrogation and the United States Marshals were thus required to inform Slaughter of his Miranda rights.  By Marshal Fils-Aime's own admission, no

12

Miranda warnings were read to Slaughter prior to the above-referenced exchange, which clearly took place while Slaughter was in custody.  Consequently, Slaughter's statement regarding his medical identification must be suppressed.

Subsequent to Slaughter requesting his medical identification, Marshal Fils-Aime asked Slaughter, while he was seated in a police vehicle, whether the bag was his.  After Slaughter responded, "Yeah," Marshal Fils-Aime asked Slaughter if the Marshal was going to find drugs or guns in the bag when he opened it, to which Slaughter replied, "Why should I tell you you're going to find it anyway."  It is clear to the Court that the above two questions as posed by the Marshal to Slaughter were express questioning on the part of the police, other than those normally attendant to arrest and custody, that the Marshal should have known were "reasonably likely to elicit an incriminating response from the suspect."  Innis, 446 U.S. at 301.  Slaughter was therefore subjected to custodial interrogation and the United States Marshals were required to inform Slaughter of his Miranda rights prior to questioning Slaughter in that regard.  By Marshal Fils-Aime's own admission, no Miranda warnings were read to Slaughter, as we previously explained, prior to the above-referenced custodial interrogation.  Accordingly, these additional statements provided by Slaughter must be suppressed.

## C.   Search of the Bag At Issue

Were we to find that the now suppressed statements previously addressed were critical to the ability of the United States Marshals to search the bag, our inquiry would end.  That would, however, overlook the doctrine of inevitable discovery, as we will discuss in detail.

We initially note that Slaughter argues that the United States Marshals violated his Fourth Amendment rights by searching the bag without his consent prior to obtaining a valid search warrant.  In response, the Government asserts that the contents of the bag would have inevitably been discovered since it is the policy of the United States Marshals Service to inventory all bags or items seized incident to a lawful arrest.

For the reasons that follow, we conclude that the United States Marshals have reasonable regulations relating to inventory procedures and specifically as they concern seizing an arrestee's property.   Slaughter's Fourth Amendment rights were not violated when the Marshals took the bag from the residence and subsequently searched the bag, because the contents of said bag would have inevitably been discovered, as it is the policy of the United States Marshals Service to inventory all items which they take custody incident to a lawful arrest, when those items have been identified as the arrestee's property.

In the case <u>sub judice</u>, there is unrebutted testimony concerning the

following events, free of any analysis that involves the now suppressed statements:

the United States Marshals arrived at 806 Wildwood Boulevard with a valid arrest

warrant for Slaughter; the United States Marshals were allowed onto the premises

and directed to Slaughter's location by Ms. Wertz; and Ms. Wertz told Marshal

Fils-Aime that the bag, located on the second floor of the residence, belonged to

Slaughter.[3]   In addition to this considerable evidence linking Slaughter to the bag,

it would be reasonable for Marshal Fils-Aime to infer that the bag belonged to

Slaughter based upon his knowledge of Slaughter's transient state and after

---

[3] The Marshal's unrebutted testimony that Ms. Wertz told him that the bag belonged to Slaughter is a crucial piece of evidence linking Slaughter to the bag found at the scene. Defendant asserts that because Ms. Wertz was not produced to testify at the suppression hearing on April 19, 2005, her statements cannot be accepted as evidence that the bag belonged to Slaughter.  Defendant contends that her statements are inadmissible hearsay in this suppression proceeding because she was not available for cross-examination and since her credibility would be in question as the controlling resident of 806 Wildwood Boulevard and its contents.

We disagree with Defendant's assertions in this regard.  The Supreme Court has instructed, and the Federal Rules of Evidence reveal, that at suppression hearings, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial. Moreover, and in support thereof, the Supreme Court has explained that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. See e.g., United States v. Raddatz, 447 U.S. 667, 679 (1980); United States v. Matlock, 415 U.S. 164, 172-74 (1974)("the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence"); Brosius v. Warden, U.S. Penitentiary, Lewisburg, PA, 278 F.3d 239, 246 n.4 (3d Cir. 2002)("Hearsay may be considered in a suppression hearing in a federal court.")(citing Raddatz, 447 U.S. at 679); Fed.R.Evid. 104(a), 1101(d)(1).  Therefore, although Ms. Wertz did not testify before the Court on April 19, 2005, her statements made at the scene to which Marshal Fils-Aime testified can and should be accepted as evidence that the bag belonged to Slaughter.  As a court may rely on hearsay at a suppression hearing, even though that evidence may not be admissible at trial, Ms. Wertz's statement conclusively linking Slaughter to the bag stands unrebutted in this case.

locating the bag in the same vicinity as that of Slaughter in the residence.  As we

previously explained, on May 2, 2003, the Marshal was directly told by an

individual he encountered at 507 Thomas Avenue that Slaughter had stayed at that

location and had departed late in the evening of May 1, 2003 for 806 Wildwood

Boulevard.  The Marshal therefore had knowledge of at least two residences visited

by Slaughter within a two day period, which was within a time during which the

United States Marshals Service was attempting to execute an arrest warrant for

Slaughter.  Accordingly, we conclude that it was reasonable for Marshal Fils-Aime

to conclusively believe that the bag belonged to Slaughter based upon the

following: the Marshal's extensive experience as a United States Marshal who

executes fugitive investigations and arrest warrants, the circumstances of his

finding the bag within Slaughter's vicinity, a reasonable credibility determination,

and most importantly, Ms. Wertz's unrebutted testimony that the bag belonged to

Slaughter.

     Finally, there is uncontroverted testimony that the policy of the United

States Marshals is to inventory all items of which the Marshals take custody

incident to a lawful arrest.  Marshal Fils-Aime testified that inventorying all items

of which the Marshals take possession is a routine policy executed in all cases, and

includes opening bags to inventory the contents thereof.  (T. on Mot. Suppress at

20-21).  In this particular case, Marshal Fils-Aime testified that he did not conduct

an inventory search of the bag because he waited to receive a search warrant for the

bag.[4]

The Court finds that it is not unreasonable for the United States Marshals, as

part of their standard operating protocols, to search a bag that belongs to an

arrested individual, in accordance with established inventory procedures.  See

Colorado v. Bertine, 479 U.S. 367, 374-76 (evidence seized during an inventory

search is admissible if the inventory was conducted in good faith under

standardized criteria).  Additionally, the Supreme Court has instructed that the

inventory search is a well-defined exception to the warrant requirement of the

Fourth Amendment.  See Bertine, 479 U.S. at 371; Illinois v. Lafayette, 462 U.S.

640, 643 (1983); South Dakota v. Opperman, 428 U.S. 364 (1976).  The policies

behind the warrant requirement are not implicated in an inventory search, nor is the

related concept of probable cause:

_____

[4] Although we cannot divine why Marshal Fils-Aime did not utilize the standard
procedures in this case, other than his contact with Mr. McCann relating to a search warrant,
which would involve inventorying the contents of the bag, the fact remains that the bag's
contents would have inevitably been discovered had the Marshals inventoried the bag, as we will
explain.  See United States v. Lockett, 2004 U.S. Dist. LEXIS 517, *11-12 (E.D. Pa.
2004)("Even if he had revoked his consent after he was arrested and taken to the police station,
the rolling suitcase and backpack would have been legally searched pursuant to the standard
inventory procedures of the Philadelphia Police Department and DEA as a valid inventory
search...During these legal searches, the contraband material...found in Lockett's bags when
[they were] searched at the police station, would have inevitably been discovered.").

> The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures...The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.

Bertine, 479 U.S. at 371 (quoting Opperman, 428 U.S. at 370, n.5).  In other words, the justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search. Lafayette, 462 U.S. at 643.

Moreover, and as previously noted, because it is the policy of the United States Marshals Service to inventory all items of which they take possession incident to a lawful arrest, the contents of the bag would have inevitably been discovered.  Nix v. Williams, 467 U.S. 431 (1984)("Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial."); see also Lockett, 2004 U.S. Dist. LEXIS 517 at *11-12.  In this case, there is abundant evidence supporting the fact that if the Marshals did not conduct the search of the bag until after having received a search warrant, an inventory search of the bag's contents would have been conducted in accordance with their standard inventory procedures.  This inventory search would have required the opening of the bag and the inevitable discovery of its contents.  See United States v. Johnson, 112 Fed. Appx. 138, 139 (3d Cir.

2004)(Suppression of the cocaine found in the bag was properly denied because the cocaine would have been inevitably discovered in an inventory search in accordance with the DEA's agent manual, which would have required opening the bag.).

In this case, no evidence has been presented to the Court that the Marshals, who were following standardized procedures in seizing what was identified to them as Slaughter's bag by the tenant of the premises, acted in bad faith or for the sole purpose of warrantless investigation of the bag's contents.  Additionally, by securing the property, the Marshals protected the property from unauthorized interference and by knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence.  See Bertine, 479 U.S. at 373. Moreover, and of particular importance in this case, such knowledge also helped to avert any safety concern to the Marshals or others that may have been posed by the property, as a weapon and ammunition were ultimately found with Slaughter's personal possessions, among other items, in the bag seized from the residence.

Finally, we note that although the evident unclarity surrounding the Affidavit prevents us from placing any reliance thereupon for the purpose of resolving this Motion, we need not do so because the doctrine of inevitable discovery, coupled with the unrebutted facts wholly outside the inconsistent areas

related to the Affidavit, allowed the Marshals to lawfully search the bag at issue in this case.

Accordingly, Slaughter's Fourth Amendment rights were not violated when the Marshals took the bag from the residence and searched the bag because the contents of said bag would have inevitably been discovered.  The items found in Slaughter's bag are therefore admissible under the inevitable discovery doctrine, and said contents should not be suppressed.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.    Defendant's Motion to Suppress Physical Evidence (doc. 249) is granted in part and denied in part to the following extent:

   a.    All statements arising from the custodial interrogation of Slaughter shall be suppressed.

   b.    The purplish-blue nylon travel bag, found at 806 Wildwood Boulevard, and its contents, are admissible at trial.

s/ John E. Jones III
John E. Jones III
United States District Judge